Q2J3ZARP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          25 CR 179 (LTS)

NOMMA ZARUBINA,

            Defendant.

------------------------------x    Plea

                                   New York, N.Y.
                                   February 19, 2026
                                   11:15 a.m.


Before:

              HON. LAURA TAYLOR SWAIN,

                             District Judge


                     APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
HENRY L. ROSS
SARAH L. KUSHNER
     Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
KRISTOFF I. WILLIAMS


ALSO PRESENT:  FBI Special Agent Peter Dubrowski

              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

Q2J3ZARP

THE DEPUTY CLERK:  This is United States v. Zarubina.

THE COURT:  Good morning, counsel.  Would you kindly state your appearances.

MR. ROSS:  Good morning, your Honor.  Henry Ross and Sarah Kushner for the government, joined by FBI Special Agent Peter Dubrowski.

THE COURT:  Good morning, Mr. Ross, Ms. Kushner, and Special Agent -- Agent or Special Agent?

MR. DUBROWSKI:  Agent is fine, your Honor.

THE COURT:  Agent Dubrowski.

MR. WILLIAMS:  Good morning, your Honor.  Kristoff Williams for Ms. Nomma Zarubina who is present.

THE COURT:  Good morning, Mr. Williams.  Good morning, Ms. Zarubina.

THE DEFENDANT:  Good morning, your Honor.

THE COURT:  I remind everyone that no recording or retransmission of any part of this proceeding is permitted, if you're there with an electronic device of any kind, and so do remember that and comply with this rule.

Mr. Williams, were you able to confer with Ms. Zarubina prior to this hearing?

MR. WILLIAMS:  Yes, your Honor.

THE COURT:  Thank you.  I'm informed that Ms. Zarubina has an application to withdraw her plea of not guilty and enter a guilty plea to Counts One and Five of the five-count

Q2J3ZARP

indictment that is numbered 25 Cr. 179.  Is that correct, Mr. Williams?

MR. WILLIAMS:  Yes, your Honor.

THE COURT:  You can stay up for a minute.

Is the plea pursuant to a plea agreement with a printed date of February 10, 2026, and an execution date of February 11, 2026?

MR. WILLIAMS:  That's correct.

THE COURT:  Do you have an executed copy of that agreement at defense table labeled as Government Exhibit 1?

MR. WILLIAMS:  Yes, I do.

THE COURT:  Do you also have at defense table an executed advice of rights form marked as Court Exhibit 1?

MR. WILLIAMS:  Yes, your Honor.

THE COURT:  Thank you.  You can be seated now.

Mr. Ross, would you make a statement regarding any victim analysis or notification activities in connection with this proceeding.

MR. ROSS:  Your Honor, the identified victims in this case are government officials, law enforcement officers, and they are aware of the proceedings today and we've been in touch with them throughout the investigation.

THE COURT:  Thank you.

Ms. Zarubina, before I accept your guilty plea, there are a number of questions that I must ask you while you're

Q2J3ZARP

under oath to assure that your plea is valid.  At times I may cover a point more than once, and I may also cover matters that were addressed in the advice of rights form that you've seen. If I do, that will be because it is very important that you understand what is happening here today.

If you don't understand something that I ask you, please say so, and I will reword the question or you may speak with your attorney.

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  Ms. DeJesus, will you please administer the oath.

(Defendant sworn)

THE COURT:  Would you please state your full name for the record.

THE DEFENDANT:  My first name is Nomma and my last name is Zarubina.

THE COURT:  Ms. Zarubina, do you understand that you have solemnly promised to tell the truth, and that if you answer any of my questions falsely, your false or untrue answers may later be used against you in another prosecution for perjury or making a false statement?

THE DEFENDANT:  Yes, I do.

THE COURT:  You can be seated for the next part of the proceeding.

Q2J3ZARP

What is your age, ma'am?  How old are you?

THE DEFENDANT:  Oh my age?  35.

THE COURT:  How far did you go in school?

THE DEFENDANT:  So I have two master's degree, one from Russia, one from the United States.

THE COURT:  So two master's, one in Russia and one in the United States?

THE DEFENDANT:  Yes.

THE COURT:  I need you to speak a little bit slower because that will help me.

THE DEFENDANT:  Yes.

THE COURT:  What fields are the master's degrees in?

THE DEFENDANT:  What are they about?  So the first master is national security and public administration from Russia, and another one there is Marxe School of Public and International Affairs, so yeah, that's like mix of political science and higher education administration.

THE COURT:  Are you able to read, speak, and understand the English language well?

THE DEFENDANT:  Yes, I hope I can, yeah.

THE COURT:  Are you a citizen of the United States?

THE DEFENDANT:  No.

THE COURT:  Are you now or have you recently been under the care of a doctor or a psychiatrist?

THE DEFENDANT:  The -- I actually had some sessions

Q2J3ZARP

with Manhattan's therapists, right.  You sent me to him, so, yes.

THE COURT:  Yes.  And so, are you taking any medications in connection with that therapy?

THE DEFENDANT:  Not.

THE COURT:  Does the condition for which you've been receiving therapy hinder your ability to think clearly or make important decisions for yourself?

THE DEFENDANT:  Yes, I think very clearly, so there is no problem with that.

THE COURT:  So it does not hinder your ability?  It doesn't stop you from thinking clearly?

THE DEFENDANT:  No, it doesn't.

THE COURT:  It does not?

THE DEFENDANT:  It does not.

THE COURT:  Thank you.

Have you ever been treated or hospitalized for any mental illness or any type of addiction, including drug or alcohol addiction?

THE DEFENDANT:  Never.

THE COURT:  Have you ever been addicted to any drugs or alcohol?

THE DEFENDANT:  I mean, we discussed already like the problems with drinking.  If I can say I'm addicted, so, it's quite difficult for me to answer this question.  I don't know.

Q2J3ZARP

I mean, it's difficult to understand what does that mean addiction.  I mean, it's like, yes, so I drink often.

THE COURT:  You have had a problem with drinking excessively?

THE DEFENDANT:  Let's say so.

THE COURT:  In the past 24 hours, have you taken any drugs, medicine or pills?

THE DEFENDANT:  No.

THE COURT:  Have you had any alcohol to drink in the last 24 hours?

THE DEFENDANT:  No.

THE COURT:  Have you smoked anything in the past 24 hours?

THE DEFENDANT:  No.

THE COURT:  Is your mind clear today?

THE DEFENDANT:  Yes.

THE COURT:  Are you feeling well physically today?

THE DEFENDANT:  Very well.

THE COURT:  Do you feel comfortable making important decisions for yourself today?

THE DEFENDANT:  Absolutely, yes.

THE COURT:  Are you represented by a lawyer here today?

THE DEFENDANT:  Yes, Mr. Williams.

THE COURT:  Thank you.

Q2J3ZARP

Mr. Williams, do you have any doubt as to Ms. Zarubina's competence to plead at this time?

MR. WILLIAMS:  I do not.

THE COURT:  Mr. Ross, do you have any doubt as to Ms. Zarubina's competence to enter a plea at this time?

MR. ROSS:  No, your Honor.

THE COURT:  Ms. Zarubina, your attorney has informed me that you want to withdraw your not guilty plea and plead guilty to Counts One and Five of the indictment.

Do you want to plead guilty?

THE DEFENDANT:  Yes, for Count One and Five.

THE COURT:  Have you fully discussed your case with your attorney, including the charges to which you intend to plead guilty, and any defenses that you may have to those charges?

THE DEFENDANT:  Yes, we fully discussed sentence by sentence all regarding plea deal.

THE COURT:  Have you and your attorney also discussed the consequences of entering a plea of guilty?

THE DEFENDANT:  Yes, we did.  We discussed everything.

THE COURT:  Are you satisfied with your attorney and his representation of you?

THE DEFENDANT:  Absolutely, yes.

THE COURT:  On the basis of Ms. Zarubina's responses to my questions and my observations of her demeanor, I find

Q2J3ZARP

that Ms. Zarubina is fully competent to enter an informed plea at this time.

Before I accept your plea, I'm going to ask you some more questions.  These questions are intended to satisfy the Court that you want to plead guilty because you are in fact guilty, and that you fully understand your rights and the consequences of your plea.

I'm now going to describe to you certain rights that you have under the Constitution and laws of the United States. You'll be giving up these rights if you plead guilty.  Please listen carefully.  If you don't understand something that I'm saying or describing, stop me, and I or your attorney will explain it more fully.

Under the Constitution and laws of the United States, you have the right to a speedy and public trial by a jury on the charges against you that are in the indictment.

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that you have the right to plead not guilty and to continue to plead not guilty to each of the charges in the indictment?

THE DEFENDANT:  Yes, I do.

THE COURT:  If there were a trial, you would be presumed innocent, and the government would be required to prove you guilty by competent evidence and beyond a reasonable

Q2J3ZARP

doubt.  You would not have to prove that you were innocent at a trial.

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  If there were a trial, a jury composed of 12 people selected from this district would have to agree unanimously in order to find you guilty.

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  If there were a trial, you would have the right to be represented by an attorney at the trial and at all other stages of the proceedings, and if you could not afford one, an attorney would be provided to you free of cost.

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  If there were a trial, you would have the right to see and hear all of the witnesses against you, and your attorney could cross-examine them.  Also, you would have the right to have your attorney object to the government's evidence and offer evidence on your behalf if you so desired.

In addition, you would have the right to have witnesses required to come to court to testify in your defense, and you would have the right to testify yourself, but you would not be required to testify.

Do you understand all of that?

Q2J3ZARP

THE DEFENDANT:  Yes, I understand, yes.

THE COURT:  Do you understand that if there were a trial, and you decided not to testify, no adverse inference could be drawn against you based on your decision not to testify?

THE DEFENDANT:  Can you repeat, please, again?

THE COURT:  Do you understand that if there were a trial, and you decided not to testify, no adverse inference could be drawn against you based on your decision not to testify?

THE DEFENDANT:  Yes, I do.

THE COURT:  So do you understand that at a trial the jury would be instructed that you have no duty to testify, and that it is not allowed to assume that you declined to testify because you were trying to hide something?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that if you were convicted at a trial, you would have the right to appeal that verdict?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand each and every one of the rights that I've asked you about?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions about any of these rights?

THE DEFENDANT:  No, it is everything about trial, so that's how I understood.  So that's actually, yes, I mean, I understand everything.

THE COURT:  Do you want to consult for a minute with Mr. Williams?

THE DEFENDANT:  No.

THE COURT:  So it's about your rights at trial, it's about your right to an attorney, it's about your right to appeal.  You understood all the things I asked you about?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that by entering a plea of guilty today, you'll be giving up each and every one of these rights?

THE DEFENDANT:  Yes, I clearly understand that.

THE COURT:  Do you also understand that you will be giving up any possible claim that your constitutional rights may have been violated?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that if you plead guilty today, you will not have a trial?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that by pleading guilty, you'll also have to give up your right not to incriminate yourself, because I will ask you questions about what you did in order to satisfy myself that you are guilty as charged and

Q2J3ZARP

you will have to admit and acknowledge your guilt?

THE DEFENDANT:  Can you repeat, please, again?

THE COURT:  Do you understand that by pleading guilty, you'll also have to give up your right not to incriminate yourself, and that is because I will be asking you questions about what you did in order to satisfy myself that you are guilty as charged, and you will have to admit your guilt and acknowledge your guilt?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that you can change your mind right now and refuse to plead guilty?  You don't have to enter this plea if you don't want to for any reason.

Do you understand that fully?

THE DEFENDANT:  I do, yes.

THE COURT:  Do you still want to plead guilty?

THE DEFENDANT:  I want to plead guilty.

THE COURT:  Have you received a copy of the indictment, that is the document with the number 25 Cr. 179 on the top, that details all of the charges against you?

THE DEFENDANT:  Yes, I have this document.

THE COURT:  Have you read it?

THE DEFENDANT:  Yes.

THE COURT:  Have you discussed it with your attorney?

THE DEFENDANT:  Yes.

THE COURT:  If you want me to, I will read out loud

Q2J3ZARP

here now in court the counts to which you propose to plead guilty, being Counts One and Five.

Would you like me to read those portions of the indictment out loud in full?

THE DEFENDANT:  Actually not.

THE COURT:  The record will reflect Ms. Zarubina has waived the public reading of the indictment.

So do you understand that Count One charges you with making false statements to the FBI in violation of Title 18 of the United States Code, Section 1001(a)(2)?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that Count Five of the indictment charges you with making false statements on your application for naturalization in violation of Title 18 of the United States Code, Section 1015?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that the government would have to prove each and every part or element of each of these charges beyond a reasonable doubt at a trial if you did not plead guilty?

THE DEFENDANT:  Yes, I do.

THE COURT:  Mr. Ross, would you please explain what the government would have to prove if we were to go to trial on Counts One and Five.

MR. ROSS:  Yes, your Honor.  As to Count One, making

Q2J3ZARP

false statements to the FBI, the government would have to prove five elements.

First, that the defendant made a statement;

Second, that the statement was false, fictitious or fraudulent;

Third, that the statement was material;

Fourth, that the statement was made knowingly and willfully; and

Fifth, that the statement was made in a matter within the jurisdiction of a department or agency of the United States.

With respect to Count Five, naturalization fraud, the government would have to prove or establish four elements.

First, that the defendant made a false statement as alleged in the indictment;

Second, that that statement was made during a naturalization proceeding in a document required by the immigration laws or regulations;

Third, that the statement was made under oath; and

Fourth, that the defendant knew the statement was false when it was made.

In addition, your Honor, the government would have to establish venue as to both Counts One and Five here in the Southern District of New York.

THE COURT:  And that would be by a preponderance of

Q2J3ZARP

the evidence rather than beyond a reasonable doubt?

MR. ROSS:  Correct.

THE COURT:  Thank you.

Ms. Zarubina, do you understand what the government would have to prove if you did not plead guilty?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that the maximum possible penalty for the crime charged in Count One of the indictment is 5 years of imprisonment, plus a fine of the greatest of $250,000, twice the gain resulting from the offense, or twice the loss to other people resulting from the offense, plus full restitution to all persons injured by your criminal conduct, plus a $100 mandatory special assessment, plus supervised release for 3 years after your term of imprisonment?

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that the maximum possible penalty for the crime charged in Count Two is also 5 years of imprisonment, plus a fine of the greatest of $250,000, twice the gain resulting from the offense, or twice the loss to other people resulting from the offense, plus full restitution to all persons injured by your criminal conduct, plus a $100 mandatory special assessment, plus supervised release for 3 years after your term of imprisonment?

Q2J3ZARP

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that the maximum possible combined penalty for the two crimes to which you're proposing to plead guilty is 10 years of imprisonment, plus a fine of $500,000, or, if greater, the sums of the relevant gains, losses, and statutory amounts relating to your offenses, plus full restitution to all persons injured by your criminal conduct, plus a total of $200 in the mandatory special assessment, plus supervised release for 3 years after your term of imprisonment?

THE DEFENDANT:  Yes, I do.

THE COURT:  I will now give you some information and verify your understanding of the supervised release aspect of the potential penalty.

Supervised release means that you will be subject to monitoring when you are released from prison.  Terms and conditions will be imposed.  If you violate any of the set terms and conditions, you can be sent back to prison without a jury trial.

If you're on supervised release and you do not comply with any of the set terms or conditions, you can be sent back to prison for up to 2 years.  You'll be given no credit for the time that you served in prison as a result of your sentence, and no credit for any time spent on post-release supervision.

So, for example, if you receive a prison term and then

Q2J3ZARP

a three-year term of supervised release, and after you left prison you lived up to the terms of the supervised release for almost 3 years, but then you violated some term of the supervised release, you could be sent back to prison for two whole years.

Do you understand that?

THE DEFENDANT:  I do understand that, yeah, fully.

THE COURT:  Do you understand that as a result of your guilty plea, because you are not a citizen, it is very likely that your removal from the United States will be mandatory, and that at a minimum, you risk being removed or suffering other immigration consequences?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand, for example, that you could be denied citizenship in the future and denied admission to the United States in the future?

THE DEFENDANT:  Yes, I do.

THE COURT:  Have you discussed the possible immigration consequences of your plea with your lawyer?

THE DEFENDANT:  Yes, we talked about that, yes.

THE COURT:  Do you understand that you will be bound by your guilty plea regardless of the immigration consequences, and regardless of any advice you may have received from your counsel or others regarding immigration consequences?

THE DEFENDANT:  Yes, I do.

Q2J3ZARP

THE COURT:  Under current law there are sentencing guidelines that judges must consider in determining your sentence.  Have you spoken to your attorney about the sentencing guidelines?

THE DEFENDANT:  Yeah, but these numbers and degrees, so yeah, we discussed it, hmm-hmm.

THE COURT:  Do you understand that in determining your sentence, the Court must calculate the applicable sentencing guidelines range, and consider that guidelines range and other sentencing factors under Title 18, Section 3553(a)?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that the Court has discretion, while taking the guidelines into account, to sentence you to any period of imprisonment from time served all the way up to the total combined statutory maximum of 10 years?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that even though your plea agreement includes a stipulated or agreed sentencing guidelines calculation, the Court will not be able to determine your sentence until after a presentence report has been completed by the probation office and you and the government have had a chance to challenge any of the facts reported by the probation office?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that you may have the

Q2J3ZARP

right to appeal your sentence under certain circumstances, even if your plea agreement provides that you are waiving your right to appeal?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that if your attorney or anyone else has attempted to estimate or predict what your sentence will be, their estimate or prediction could be wrong?

THE DEFENDANT:  Yes, of course, I do understand, yeah.

THE COURT:  No one, not even your attorney or the government, can or should give you any assurance of what your sentence will be, because your sentence cannot be determined until after the probation office report is completed, and I have ruled on the challenges to the report, and I have determined what the appropriate sentence is.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  Do you also fully understand that, even if your sentence is different from what your attorney or anyone else told you it might be, or if it is different from what you expect, you will still be bound to your guilty plea and you will not be allowed to withdraw your guilty plea?

THE DEFENDANT:  Yes, I fully understand.

THE COURT:  Would you please look at page 2 of the plea -- actually let me get the right page reference because I'm not sure I wrote it down correctly.

Q2J3ZARP

Starting at the bottom of page 3 of the plea agreement, the portion that is captioned (C) sentencing range. Do you have that in front of you?

THE DEFENDANT:  Yes.

THE COURT:  According to this agreement, the stipulated sentencing guideline range is from 18 to 24 months of imprisonment.

Do you understand that this stipulation does not bind the Court or the probation office as to the facts on which it is based, as to how to apply the guidelines to the facts, or as to what will be an appropriate sentence in your case?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that I may decide to impose a sentence that is outside of the guideline range?

THE DEFENDANT:  Yes, I understand.

THE COURT:  Are you now serving any state or federal sentence or are you being prosecuted for any other crime?

THE DEFENDANT:  No.

THE COURT:  Please look again at the plea agreement which has a label written on it Government Exhibit 1.

Have you signed the agreement?

THE DEFENDANT:  Yes, I have signed this agreement.

THE COURT:  Did you read it before you signed it?

THE DEFENDANT:  I read, yes.

THE COURT:  Did you discuss it with your attorney

Q2J3ZARP

before you signed it?

THE DEFENDANT:  We did discuss everything, yes.

THE COURT:  Did you fully understand it before you signed it?

THE DEFENDANT:  I fully understood, yes.

THE COURT:  Does the agreement reflect accurately your complete and total understanding of the entire agreement between the government, your attorney, and you?

THE DEFENDANT:  Can you repeat the question, please?

THE COURT:  Okay.  Does the agreement reflect accurately your complete and total understanding of the entire agreement between the government, your attorney, and you?

(Defendant conferring with her counsel)

THE DEFENDANT:  So, yes.

THE COURT:  Is everything that you understand about your plea and sentence covered in the agreement?

THE DEFENDANT:  Yes.

THE COURT:  Has anything been left out?

THE DEFENDANT:  No.  No.

I mean, I have some maybe, that's not question which is essential for me, maybe small thing for you, but -- hold on. But, I can just leave this comment to our final court, like an additional circumstances or something, because I don't want to talk about that today.

Anyway, I signed already the document, and so, I just

Q2J3ZARP

have some like small new answers to discuss with you, but it's not so important.  It will not impact, you know, my decision anyway.

THE COURT:  You said you have some things you want to discuss?

THE DEFENDANT:  Just about something I found here. But --

THE COURT:  Speak to Mr. Williams just to make sure you don't adversely say something in front of the government that they shouldn't hear.  Why don't you tell Mr. Williams what the problem is.  I want to make sure you fully understand this written agreement and you understand that this is the agreement.  And so if there is something here that you don't agree to, you need to tell Mr. Williams and we need to figure out where we go from there.

THE DEFENDANT:  No, I agreed with everything.  Just --

(Defendant conferring with her counsel)

THE DEFENDANT:  So actually, it's not a question.  I agreed with everything.  So it's just my comments.  We can leave to May in our final court to discuss more, but it will not impact my decision anyway.  So...

THE COURT:  There are issues you want to talk about at the time of sentencing?

THE DEFENDANT:  No, it's not an issue.  So just I agreed with everything so we can just leave it.

Q2J3ZARP

THE COURT:  So you agree with everything that is in this written plea agreement?

THE DEFENDANT:  Yes.

THE COURT:  You're comfortable with having signed it?

THE DEFENDANT:  I signed it.  It was not easy for me but I signed, yes.

THE COURT:  You understood everything in it?

THE DEFENDANT:  I understood.  Just one small essential comment for me, but I can provide this comment in my -- if we have court in May.  It's not even a question.  It's just comment, just reflection.  So...

THE COURT:  You understand that this is what the government has agreed to?

THE DEFENDANT:  Yes.

THE COURT:  And Mr. Williams, I see that you had some consultation with Ms. Zarubina.  Are you comfortable with her representation that she understands that this written agreement is what governs the agreement between the government and the defense?

MR. WILLIAMS:  Yes, your Honor.

THE COURT:  So, Ms. Zarubina, has anyone made any promises to you, other than what's written in the agreement, or threatened you or forced you to plead guilty or enter into this plea agreement?

THE DEFENDANT:  No.

Q2J3ZARP

THE COURT:  Do you understand that on pages 2 and 3, the agreement includes a stipulation that you agree that you willfully attempted to obstruct or impede the administration of justice with respect to the prosecution of Count One by attempting to unlawfully influence a witness to the charged offenses?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that this fact affects sentencing calculations under the guidelines?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that you are under no obligation to make an agreement with the government about that fact?

THE DEFENDANT:  Yes.

THE COURT:  And did you willfully attempt to obstruct or impede the administration of justice with respect to the prosecution of Count One?

THE DEFENDANT:  Just a second.

(Defendant conferring with her counsel)

THE DEFENDANT:  So that's about messaging, right? Yes, I understood.

THE COURT:  It is about -- what did you say?

THE DEFENDANT:  About text messaging, right?

THE COURT:  I believe that is what the government contends you did that is the obstructive conduct.

Q2J3ZARP

Is that correct, Mr. Ross?

MR. ROSS:  That's right, your Honor.

THE COURT:  So, yes.  Do you understand that on page 5, the plea agreement provides that you will not file a direct appeal or challenge by petition pursuant to Title 28 Section 2255 or any other legal provision your conviction?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that you have no obligation to enter into this stipulation concerning any appeal or challenge of your conviction?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that, also on page 5, your agreement provides that you will not file a direct appeal or otherwise challenge by petition pursuant to Section 2255, or any other provision, any custodial sentence of up to 24 months of imprisonment?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that, again on page 5, the agreement provides that you will not appeal or challenge any term of supervised release that is 3 years or shorter?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that the agreement also provides that you will not appeal or challenge any condition of supervised release that is imposed by the Court for which you had notice, including notice from a recommendation by the

Q2J3ZARP

probation office in the presentence report, and to which you had an opportunity to object?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that on page 5 your agreement provides that you will not appeal or challenge any fine of $75,000 or less?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that your agreement on page 6 provides that you are affirming that you want to plead guilty regardless of any immigration consequences of your plea and conviction, even possible deportation, and that you will not be able to withdraw your guilty plea based on any immigration consequences of your plea and conviction?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that also on page 6 your plea agreement provides that you are giving up your right to appeal or litigate or challenge your sentence collaterally under Section 2255 and/or 2241 on the basis of any adverse immigration consequences that may result from your guilty plea and conviction?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that you're under no obligation to waive your rights to appeal or otherwise litigate any aspect of your sentence?

THE DEFENDANT:  Yes, I do.

Q2J3ZARP

THE COURT:  Do you understand that on page 5 the agreement provides that the appeal and collateral challenge waiver provisions that we've just discussed do not affect whatever rights you may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that, again, on page 5, the agreement provides that you are waiving any and all right to withdraw your plea or attack your conviction or sentence, either on direct appeal or collaterally, on the ground that the government has failed to produce any discovery material, other than information establishing your factual innocence, including Jencks Act material, material pursuant to the Supreme Court's *Brady v. Maryland* decision, and impeachment material pursuant to the Supreme Court's *Giglio v. United States* decision, that has not already been produced as of the date of the signing of your plea agreement?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand that even if the government does not oppose or take a position on what your attorney will ask as a sentence, I am free to impose whatever sentence I believe is appropriate under the circumstances and the applicable law, and you will have no right to withdraw your plea?

Q2J3ZARP

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you still want to plead guilty pursuant to this plea agreement?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Mr. Williams, do you know of any valid reason why Ms. Zarubina would prevail at trial?

MR. WILLIAMS:  No, your Honor.

THE COURT:  Do you know of any reason why she should not be permitted to plead guilty?

MR. WILLIAMS:  No, your Honor.

THE COURT:  Ms. Zarubina, would you please stand and tell me what you did that makes you guilty of the crimes charged in Counts One and Five.

THE DEFENDANT:  So, actually, I clearly remember that day on April 20, 2021.  In Southern District of New York I made a false statement to --

THE COURT:  I need you to speak more slowly so I can understand you clearly.

THE DEFENDANT:  On April 20, 2021, in the Southern District of New York, in the cafeteria, I made a false statement to FBI agent Neil Summers, and it was my initiative to meet with him that day and provide information I decided to provide him.  So, but he scared me, and I answered wrong on his question, which is if I have communications with the Russian government or Russian intelligence services that time, and I

Q2J3ZARP

answered him no.  But in fact, I had.  So this is about Count One.

THE COURT:  So, you say that you misunderstood him. Are you saying that you didn't deliberately lie to him?

THE DEFENDANT:  No.  I understood him.  He just scared me because, actually, I was responsible that moment before my initiative to pass information not to the FBI but to the CIA, but I was not --

(Defendant conferring with her counsel)

THE DEFENDANT:  So, and he asked me the question.  I understood that question.  But I was scared and I answered wrong because I was scared.  Not because I misunderstood him. I understood the question.  So...

THE COURT:  So did you know, when you say you answered wrong, do you mean that -- you say that you answered wrong.

THE DEFENDANT:  Yes.

THE COURT:  Was the information that you gave him false?

THE DEFENDANT:  Yes, my answer was false.

THE COURT:  And did you know at the time that it was a false answer that you were giving him?

THE DEFENDANT:  Can you repeat, please, the last part?

THE COURT:  Did you know when you said this, that in relation to what he asked you, the answer you gave him was false?

Q2J3ZARP

THE DEFENDANT:  Yes.

THE COURT:  Did you understand that it was something that he was asking you because it was believed to be important or material to what you were talking about?

THE DEFENDANT:  It was hard conversation because it was first time for me to actually connect with the American special service and I didn't understand how to behave properly. And I was scared.  So I just remember my condition, my emotional condition that moment.  But I fully understood that I just perplexed him that moment, and I made a false statement. Yes.

THE COURT:  Do you understand that you made a false statement about something that was important?

THE DEFENDANT:  Everything was important regarding our talk with me and Neil Summers in general.  We talked only about important things.  So, yes, I mean, his question was also important.

THE COURT:  And did you make a decision to give him this false answer?

THE DEFENDANT:  No.  I haven't prepared, like, answers for him.  So, I just remember I was scared because of him because of his personality.  So, I don't know why, but that was my emotional condition that moment.

So I usually very brave, you know me, right, so to talk.  But not with him.  With him it was absolutely different.

Q2J3ZARP

And he asked me questions and I just answered fast, but I answered wrong.

THE COURT:  Did you deliberately answer falsely?

THE DEFENDANT:  What does this mean "deliberate"?  If I wanted to?

Yes, it was my decision to answer this way, it was my decision.

THE COURT:  So it was your decision to give that answer.

THE DEFENDANT:  Yes.

THE COURT:  And you knew the answer was false?

THE DEFENDANT:  Yes, I knew the answer was false.

THE COURT:  Now, how about what you did that makes you guilty of the charge in Count Five?

THE DEFENDANT:  About another one, Count Five?  Yeah, naturalization.  So that's a good one.

So on July 11, 2022, I filled out the form by myself, so answering questions online.  I made a false statement in one question over there in my naturalization application.  I wrote that I had not previously engaged in unlawful sexual activity, so, and I answered no.  But I supposed to answer yes, and it was another false statement in naturalization form.

So, but I have never answered any questions in front of immigration officers, so, I haven't experienced to fill out any documents also.  And I answered without actually fully

Q2J3ZARP

understanding the question.  And yes.  But it's -- like similar story.  That's another false statement.

THE COURT:  Did you know that you were giving those answers under oath, that you were swearing that the answers were true?

THE DEFENDANT:  Yes.

THE COURT:  And did you know that that answer was false at the time you put that answer on the form?

THE DEFENDANT:  Yes.

THE COURT:  So, you understand that the form was asking you whether you had done a particular thing, correct?

THE DEFENDANT:  Yes.

THE COURT:  And it was something that you had in fact done, correct?

THE DEFENDANT:  Yes.

THE COURT:  But you said that you had not done it?

THE DEFENDANT:  Yes.

THE COURT:  And you knew at the time that that was a false answer?

THE DEFENDANT:  So, yes.  Because that's why we have actually interview with immigration officer when we try to understand the whole meaning of each question, and this and that.  And but, it was actually a question for me I should have answered.  But, I just answered "no" instead of "yes."

THE COURT:  And that wasn't because you misunderstood

Q2J3ZARP

the question?

THE DEFENDANT:  It's a bit hard question, because it depends how we look at definitions, because I am a person who love definitions, I love to read books and understand what does it mean this particular thing, and I love to speak to people about meaning of different things.

And I filled out the form answering just yes, no, yes, no, wherever, like, they wanted me in the application.  But, I stopped on that question, I thought, and I just answered "no."  Just to finish this application and just, you know, forget about the application, just waiting for the second stage.

But it was a false statement.  So we can say that, yes.

THE COURT:  So you knew what was being asked?

THE DEFENDANT:  Yes.

THE COURT:  And you knew that your "no" answer was a false answer?

THE DEFENDANT:  Yes.

THE COURT:  Counsel, do you want to consult with each other before we go on?

MR. ROSS:  If we could have just a moment please, your Honor.

THE COURT:  Yes.

(Counsel conferring)

(Defendant conferring with her counsel)

Q2J3ZARP

THE DEFENDANT:  I just want to clarify.  So I understood the question and I answered wrong.  So that's it, yeah, I answered falsely.

THE COURT:  Thank you.  When you gave these false answers and statement, did you know that what you were doing was wrong?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Ross, does the government wish any further factual matters to be addressed in the plea allocution?

MR. ROSS:  No, your Honor, no factual matters to be addressed.  I am happy to proffer what the government would establish as to venue at the appropriate time.

THE COURT:  Yes, I would appreciate that proffer and a summary of your evidence against Ms. Zarubina now.

MR. ROSS:  So, your Honor, with respect to Count One, the government's evidence at trial would include the following, among other things:  Testimony from FBI agents who participated in interviews of Ms. Zarubina, including the April 20, 2021 interview, and testimony that in that interview Ms. Zarubina denied any contact or relationship with Russian security or intelligence services.  The evidence would also include testimony from FBI agents who participated in June and July 2024 interviews of Zarubina in which she admitted to making prior false statements and explained her relationship and contact with the FSB, including by receiving taskings.

It would include photographs from Ms. Zarubina's social media account, corroborating that she attended an event at an FSB officer's direction and took photographs of contact information for a journalist as the officer had requested.

It would also include evidence from Ms. Zarubina's cell phone showing contact information for that FSB officer, and a photograph that another officer, another FSB officer sent to Ms. Zarubina of an FSB epaulet.

The evidence would include travel records confirming Ms. Zarubina's travel to Russia during the time that she later admitted to meeting with the FSB officer. And it would include admissions, both publicly following her arrest and in her post-arrest statement, that she had made false statements to the FBI.

The government can also proffer as to materiality that the testimony and the evidence at trial would show that the testimony -- that there were statements made by Ms. Zarubina to FBI agents who were investigating matters relating to foreign -- specifically Russia -- malign influence, and Ms. Zarubina was aware of that fact and that that investigation was within the jurisdiction of the FBI.

With respect to venue, the government would show as to Count One that the meetings, including the April 2021 meeting with Zarubina, took place in the Southern District of New York, specifically in Manhattan.

Q2J3ZARP

Regarding Count Five, the government's evidence at trial would include the following:

That Ms. Zarubina submitted an application for naturalization in which she affirmed under penalty of perjury that the information provided in that application was true and accurate. And it would include the answer that your Honor was just discussing with Ms. Zarubina in which Ms. Zarubina stated that she had never been a prostitute or procured anyone for prostitution.

The government would prove that that statement was false by, among other things, introducing text messages from Ms. Zarubina's phone showing communications with the manager of a massage parlor in New Jersey and with others arranging commercial sex activity, and driving women to and from the massage parlor where the commercial sex activity was taking place. It would also include post-arrest admissions from Ms. Zarubina to engaging in that activity, location data showing her travel across state lines to and from that business, testimony from law enforcement officers who surveilled Ms. Zarubina picking up women and transporting them from Brooklyn to the massage parlor, license plate reader information, and testimony from law enforcement officers who conducted a search of the massage parlor in New Jersey based on an undercover sting operation.

And as to Count Five, your Honor, the government would

Q2J3ZARP

establish venue by showing, among other things, that the
defendant transported women to the massage parlor in New Jersey
over the Verrazzano Bridge, which is within the joint
jurisdiction of the Eastern District of New York and the
Southern District of New York.

THE COURT:  Thank you.

MR. ROSS:  Excuse me, your Honor.  I think the venue
basis for Count Five would also include the fact that the
naturalization application on which the false statement was
made was pending before the USCIS office here in Manhattan at
the time that the application was submitted.

THE COURT:  Thank you.

Ms. Zarubina, would you please --

THE DEFENDANT:  Just one small note for me.
Everything they have from my phone, and from me, actually, I
volunteered.  In other words, I just give it to Summers.  It
wasn't the story, like, I worked for Russians since they led
investigation and they found me.  I was very persistent in
communications with them, and I initiated five out of eight our
meetings.  So it was my initiative to share information with
them and they never appreciated that.

I think this is very essential point of this story,
because I don't think we have a lot of people who call the FBI
every day and say, you know what, I have something from Russia
I want to share with you.  So my story was about that.

Yes, I made a false statement in the beginning, but after that I gave them a lot. And I give them just voluntarily. I never ask them for something else. Not for gifts, not for money, not for work, not for promotions, just a little respect maybe or my like security. So, and they never appreciated that.

And technically I led the investigation by myself against myself. So, and Mr. Dubrowski, for example, he literally, like, technically he did nothing in this story. He just used what I provided him, so, and so now he's like an investigator in this story.

So I think it is essential point that I called them and I called them a lot because I thought it's absolutely important to share information about Russian intelligence, especially when we have situation in Ukraine, for example, and I have a lot of friends from there.

THE COURT: Ms. Zarubina.

THE DEFENDANT: I'm sorry about --

THE COURT: Thank you. So you and Mr. Williams can work together on your submissions in connection with your sentencing and frame for me the context in which you want me to see and understand what you did. And the government of course will be making its submission with its perspective. But that's the better time to go into these matters, because today my inquiry is about your understanding of the charges, what you

did in relation to those specific charges, and then your plea as to each of the charges. And that's the stage that I'm up to now.

So, would you please stand, and Mr. Williams, would you stand as well.

Ms. Zarubina, how do you now plead to the charge in Count One of the indictment, false statements to the FBI? Do you plead guilty or not guilty?

THE DEFENDANT: I plead guilty.

THE COURT: How do you now plead to the charge in Count Five of the indictment, false statement in the naturalization application? Do you plead guilty or not guilty?

THE DEFENDANT: I plead guilty.

THE COURT: Are you pleading guilty to each of these charges because you are in fact guilty of the crimes charged?

THE DEFENDANT: Yes.

THE COURT: Are you pleading guilty voluntarily and of your own free will?

THE DEFENDANT: My own free will.

THE COURT: Would you please look at Court Exhibit 1 which is the advice of rights form. Have you signed this form?

THE DEFENDANT: Yes, I did.

THE COURT: Did you read it before you signed it?

THE DEFENDANT: Yes, we did together.

THE COURT: Did you discuss it with your attorney

Q2J3ZARP

before you signed it?

THE DEFENDANT:  Yes.

THE COURT:  Did you understand it before you signed it?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Williams, did you also review and sign Court Exhibit 1?

MR. WILLIAMS:  I did, your Honor.

THE COURT:  Mr. Williams, are there any other questions that you believe I should ask Ms. Zarubina in connection with this plea?

MR. WILLIAMS:  No, your Honor.

THE COURT:  Mr. Ross, are there any other questions that you believe I should ask in connection with this plea?

MR. ROSS:  No, your Honor.

THE COURT:  Ms. Zarubina, you have acknowledged that you are guilty as charged in Counts One and Five of the indictment.  I find that you know your rights and that you are waiving them voluntarily.

Because your plea is entered knowingly and voluntarily and is supported by an independent basis in fact containing each of the essential elements of each offense, I accept your guilty plea and I adjudge you guilty of the offense as charged in Counts One and Five of indictment number 25 Cr. 178.

Mr. Williams, do you wish to be present for any

Q2J3ZARP

interview of Ms. Zarubina in connection with the presentence report?

MR. WILLIAMS:  Yes, please.

THE COURT:  I will make that direction.  And now please be seated again and I'll ask Ms. DeJesus to give us a sentencing date.

THE DEPUTY CLERK:  June 11, Thursday, June 11, at 11 a.m.

THE COURT:  Is everyone available on Thursday, June 11 at 11 a.m.?

MR. ROSS:  Yes, your Honor.

MR. WILLIAMS:  Yes, your Honor.

THE COURT:  Sentencing set for June 11, 2026, at 11 in the morning.

Counsel, please make sure to get your comments and any objections back promptly to the probation office on the first disclosure of the report, and make your sentencing submissions in accordance with my sentencing submission practices which are part of my individual practices on the website.

And will the government provide its factual summary to probation within the next two weeks?

MR. ROSS:  Yes, your Honor.

THE COURT:  Thank you.

Ms. Zarubina, the probation office is going to be preparing a presentence report to assist me in sentencing you.

You'll be interviewed by the probation office.  It is important that the information that you give to the probation officer is truthful and accurate.  The report is important in my decision as to what your sentence will be.  You and your attorney have a right and will have an opportunity to examine the report, to challenge or comment on it, and to speak on your behalf before sentencing.  Failing to be truthful with the probation office and the Court may have an adverse effect on your sentence and may subject you to prosecution.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Thank you.

Mr. Williams, do you have an application?

MR. WILLIAMS:  Yes, your Honor, related to bail pending sentencing, we have a small request.

Given the likelihood that Ms. Zarubina will be subject to removal proceedings following sentencing, we would ask that the Court would grant her release for a one-week period prior to sentencing for a number of reasons.  One is so that she can gather her belongings, close out anything she needs to close out here in the U.S., and secondly, more importantly, as the Court is aware, she has a young daughter who is a U.S. citizen, and has not been able to see her mother since being taken -- having her bail revoked last year.

So for those reasons, your Honor, we are asking the

Q2J3ZARP

Court to consider a short window of release prior to
sentencing.  She would be happy to abide by any conditions that
the Court would impose.

And just for additional context, your Honor, the
reason why Ms. Zarubina had her bail revoked was because she
continued to text a case agent, and it was the government's
position she was trying to influence this agent.  Given that
there is a guilty plea now, I think that may be less of a
concern.  And again, we are asking for a very short window of
time for her release.  She would self-surrender soon after
that.

THE COURT:  Mr. Ross.

MR. ROSS:  Your Honor, we would oppose that request.
It was only two and a half months ago that your Honor found
that no conditions of release could ensure the safety of the
community.  There is absolutely no reason to revisit that
decision now.

It's very common for defendants through family and
other friends and through their attorneys to make arrangements
for family matters and other things while they're detained.
Ms. Zarubina certainly had an opportunity to make those
arrangements in November and December prior to the last bail
hearing.

So there is no reason to release her now and to risk
her resuming the types of harm, the types of harassment that

Q2J3ZARP

led to her detention in the first place.

I also want to address Mr. Kristoff's point that there is, as he says, less concern that she will resume texting the FBI agent at issue here. There is a significant amount of concern she will continue to do exactly that. Although it is the case there was evidence that she was trying to obstruct the proceeding, I think there are really two points here, your Honor. One is there is very much still an opportunity to obstruct this proceeding. There is an investigation that's going to be conducted by the probation department, the FBI victim in this case may have a right to make a statement in connection with sentencing. There is still a sentencing proceeding to be held here, your Honor, and protecting the integrity of that is extremely important.

And the other point, your Honor, is that there was also a finding by the Court that there was probable cause about cyberstalking. That's a separate federal crime that has nothing to do with one's motive to obstruct a proceeding. And the defendant has just as much motive, perhaps more motive now, to engage in that cyberstalking activity.

It's now a certainty she has been convicted of felonies that carry significant sentences in connection with some of her dealings with that victim, with that witness. So the idea that she would no longer have a motivation to engage in harassing, threatening, otherwise inappropriate conduct,

that's simply not true, your Honor.  There is every motivation for that to happen.

Last point I want to raise is really the only thing that has changed in the last two-plus months since your Honor ordered detention, that's the legal standard in light of Ms. Zarubina's convictions today.  Under Section 3143(a)(1), now that Ms. Zarubina's been convicted, she is the one who bears the burden of establishing that, if released, even if it's just for a week, she would not pose a danger to the community or be a flight risk.

The government established that, as your Honor held when it carried the burden by clear and convincing evidence just two months ago.  There is certainly no reason now to find that Ms. Zarubina, who carries the burden, has made that showing by clear and convincing evidence.

THE COURT:  Thank you.

Anything further, Mr. Williams?

MR. WILLIAMS:  Yes, your Honor.  I would just reiterate that when on release, Ms. Zarubina did attend all court proceedings.  I don't believe there is any real risk of flight here.  The primary danger that the government raises is to a case agent receiving text messages.  This is not a member of the general public, I don't think there is any evidence that she poses a danger to the general public.

But again, we would agree to any, any restriction that

Q2J3ZARP

the Court would impose.  This would be for a very short window.  And given that there is a guilty plea, I do think that there is less of a concern about texting the agent or obstructing any --

THE COURT:  Was there something further you wanted to say?

MR. WILLIAMS:  No, your Honor.

THE COURT:  Mr. Ross?

MR. ROSS:  Just to respond to that briefly, your Honor.  I won't go through the whole history with this case which your Honor is deeply familiar with.  Just to point to one example that I think is relevant and shows the lack of regard that Ms. Zarubina has had for the Court's orders in the past.

Back in November, the Court scheduled the bail hearing for December 2 after a series of harassing messages against the case agent.  Then Ms. Zarubina met with her probation officer, expressed no remorse, made an admission, as she has done today, that she was responsible for the alleged conduct and indicated she had no intent to change her conduct or to conform it to the law.

And then once again, your Honor, while a bail hearing was pending, had been scheduled for December 2 by this Court, she resumed her pattern of communications.  And that was within the time period of a week, which is essentially what she is asking for here.

So the defendant's most recent conduct while out on

Q2J3ZARP

release within a very short period of time, having just admitted responsibility for misconduct, and knowing that she had a pending sanction for that misconduct, still violated the Court's orders. So that is the concern we have is going to happen all over again.

THE COURT: Thank you.

I found when I revoked bail that the government had carried its burden of showing that no condition or set of conditions would assure that Ms. Zarubina would not pose a danger with respect to her repeated outreach to the case agent, which is a threat to the agent, but importantly, a threat to the community in the form of interference with the integrity of this judicial process. I referred at that time to the trial process.

But as Mr. Ross has pointed out, this is an ongoing proceeding. My probation office is going to make an investigation, I'm going to be making determinations in connection with sentencing. And Ms. Zarubina has consistently downplayed the very serious implications of her very serious harassing conduct, which I also found the government had shown probable cause to believe that it rose to the level of cyberstalking.

At this point, given Ms. Zarubina's guilty plea, Ms. Zarubina has the burden of showing by clear and convincing evidence that she's not likely to pose a danger and also that

Q2J3ZARP

there isn't a risk that she would flee.  Ms. Zarubina has not met that burden.

And so, while I understand that not being able to conclude her affairs and spend time outside with her daughter before the likely deportation is a great burden, it is a very significant thing, I find that she has not met the requirement for bail, even for that short period of time.  And the application is denied.

Counsel, is there anything further that we need to take up this afternoon?

MR. ROSS:  Very minor point, your Honor.  Just to put on the record that the docket number for the indictment is 25 Cr. 179.  I believe your Honor stated the number correctly earlier in the proceeding, but I thought I heard 178 just a moment ago, so I just wanted to make clear Ms. Zarubina had pled to indictment number 25 Cr. 179.

THE COURT:  I thought I got it right both times but let me just say that as clearly as I can.

I have accepted Ms. Zarubina's guilty plea to Counts One and Five of indictment number 25 Cr. 179, and I adjudge her guilty of the crimes charged in those counts of indictment 25 Cr. 179.

MR. ROSS:  Thank you, your Honor.  Nothing further from the government.

THE COURT:  Anything further from the defense?

Q2J3ZARP

MR. WILLIAMS:  No, your Honor.  Thank you.

THE COURT:  All right.  Thank you all.  Stay safe and keep well.  We are adjourned.

(Adjourned)