

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 4, 2026

**BY ECF**
The Honorable Laura Taylor Swain
Chief United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:    ***United States v. Nomma Zarubina*, 25 Cr. 179 (LTS)**

Dear Chief Judge Swain:

The Government respectfully submits this letter in advance of the June 11, 2026 sentencing of the defendant, Nomma Zarubina.  As set forth below, the defendant worked in the United States on behalf of a Russian intelligence service and lied to conceal that fact from the Federal Bureau of Investigation ("FBI"); helped manage a prostitution business and lied to conceal that fact in her citizenship application; and, after being charged and arrested, continually threatened and attempted to tamper with and harass an FBI agent, in defiance of the Court's repeated orders.  The Government therefore submits that a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 18 to 24 months' imprisonment is necessary and appropriate in this case.[1]

## I.    Offense Conduct

### a.    The Defendant's False Statements to the FBI

The defendant began meeting with the FBI in October 2020, after the FBI approached her in connection with its ongoing investigation into Elena Branson.  (PSR ¶ 15).  Branson is a Russian national who acted at the direction of the Russian government to spread Russian influence in the United States, including through her organization, the Russian Center New York ("RCNY").  (*Id.* ¶ 10).  Branson was publicly charged in March 2022 for acting as an unregistered foreign agent of Russia, and has not yet been apprehended.  (PSR ¶ 12).  The defendant had a close relationship with Branson and worked as a Political Affairs Officer for RCNY for many years, maintaining RCNY's website, drafting and posting articles, and even speaking at an event led by Branson.  (*Id.* ¶¶ 10, 14-16).

During an April 20, 2021 meeting with the FBI, the defendant told interviewing agents that she had not had any contact with Russian intelligence services.  (PSR ¶ 19).  Then, in a September 20, 2023 interview, the defendant told the FBI that she had been interviewed once by the Federal

---

[1] The Probation Office recommends that the Court impose a sentence of 18 months' imprisonment. (May 28, 2026 Final Presentence Investigation Report ("PSR") at 28-30).

Security Service of the Russian Federation ("FSB") on her way back to Russia from the United States, but that she had not been interviewed by the FSB or Russian intelligence services on any other occasions. (*Id.* ¶ 25). The FSB is Russia's principal security agency and the successor to the former Soviet Union's Committee for State Security, known as the KGB. (*Id.* ¶ 7). The FSB has been sanctioned by the U.S. Department of Treasury and the U.S. Department of State for, among other things, wrongfully detaining U.S. nationals and conducting global malign influence operations. (*Id.*).

The defendant's statements about her limited contact with Russian intelligence services were false. (PSR ¶ 9). In June and July 2024, the defendant admitted to the FBI that she had previously lied to the FBI about her relationship with the FSB. (PSR ¶¶ 27, 30, 32). Specifically, in a June 27, 2024 interview with the FBI, the defendant acknowledged that she had previously withheld from the FBI information about her work with a particular FSB officer ("FSB Officer-1"), including his name, and described details regarding the nature of her prior contacts with, and work for, FSB Officer-1, that she had previously withheld. (*Id.* ¶ 27). In a July 24, 2024 interview with the FBI, the defendant provided additional information that she had previously withheld regarding the extent of her working relationship with FSB Officer-1. (*Id.*). The defendant admitted that she had previously falsely denied contacts with the FSB because she feared disclosing those relationships to the FBI, and because she had not known the FBI agents long enough to be entirely truthful during those earlier interviews. (*Id.* ¶ 32).

### b. The Defendant's Admissions Regarding Her Work With the FSB

As the defendant ultimately admitted to the FBI, in December 2020, while in Russia, she agreed to assist the FSB. (PSR ¶¶ 7, 9). The defendant told the FBI that, pursuant to her agreement with a particular FSB officer ("FSB Officer-1"), the defendant was asked to engage in "network marketing" on behalf of the FSB inside the United States. (PSR ¶ 9). Her assignments included attending events and cultivating relationships with prominent U.S. officials, academics, and journalists. (*Id.* ¶¶ 9, 27). For example, at FSB Officer-1's request, the defendant attended the 2021 St. Petersburg International Economic Forum (the "SPIEF") in order to help identify journalists who would be willing to provide positive coverage of the event and of Russia more generally. (*Id.* ¶ 28). The defendant took several photographs of herself and others at the SPIEF, including with prominent business leaders such as the founder of Canada Eurasia Russia Business Association, and the Deputy Chief Executive of the Tatarsan Investment Development Agency, a special executive body of the government of the Republic of Tatarsan that is responsible for all

international investment and business projects in the Republic of Tatarsan.  (*Id.*).  Some of those photographs are depicted below:

 

Also while attending the SPIEF, the defendant took a photograph of the contact information of a producer at a German public, state-owned international media company.  (PSR ¶ 28).

According to the defendant, FSB Officer-1 also directed the defendant to obtain information about, and reach out to, individuals at U.S.-based think tanks and other organizations on a list that he provided to the defendant.  (PSR ¶ 28).  The FSB assigned the defendant the codename "Alyssa," and the defendant remained in regular contact with FSB Officer-1, including via encrypted messaging applications and several in-person meetings, until at least 2022.  (*Id.* ¶¶ 9, 27).

During the relevant time period, the defendant also communicated with a second FSB officer ("FSB Officer-2"), including via an encrypted messaging application.  (PSR ¶¶ 24, 31).  FSB Officer-2 described the defendant's official FSB profile to the defendant, which he told her

noted that she was a good communicator. (*Id.*). During the course of their communications, FSB Officer-2 sent the defendant a photograph of his FSB epaulet, depicted below:



### c. The Defendant's Participation in Commercial Sex Activities and Naturalization Fraud

Between approximately 2018 and 2024, the defendant participated in a scheme to transport women between New York and New Jersey to engage in prostitution at a massage parlor business ("Business-1") in East Brunswick, New Jersey. (PSR ¶¶ 33-34). The defendant communicated with the manager of Business-1 to help run the prostitution business. (*Id.* ¶ 34). She also drove women to Business-1 to participate in commercial sex activity and interacted with clients to coordinate commercial sex activity and discuss pricing. (*Id.*). The defendant was compensated for her role in the scheme. (*Id.* ¶ 35).

On July 11, 2022, the defendant falsely stated in response to a question in her online Form N-400 application for naturalization in the United States that she had never "procured anyone for prostitution." (PSR ¶ 37). The defendant falsely affirmed under penalty of perjury that the information she had provided in the application was true and accurate. (*Id.*).

During a September 19, 2024 call with the FBI, and in her November 21, 2024 post-arrest statement, the defendant admitted to her involvement in prostitution-related activities at Business-1. (PSR ¶ 35-36).

### d. The Defendant's Offenses While Released on Bail

As described in Section II.b below, after being arrested and ordered released pending trial, the defendant engaged in witness tampering and cyberstalking against Witness-1 on numerous occasions over an approximately nine-month period. As a result of these violations of her bail conditions, on December 2, 2025, the Court revoked the defendant's bail and ordered her detained pending trial.

## II.    Procedural History and the Defendant's Violations of Her Release Conditions

### a.    Charges and Arrest

On November 19, 2024, the defendant was charged by Complaint with two counts of making false statements to FBI agents, including two agents who are identified in the Complaint as Case Agents-1 and -2, in violation of Title 18, United States Code, Section 1001(a)(2). (Dkt. 1). On the same date, a warrant was issued for her arrest. (*Id.*). On November 21, 2024, the defendant was arrested on the charges in the Complaint, presented before United States Magistrate Judge Stewart D. Aaron, and released on bail pursuant to conditions, including a condition to "avoid all contact, directly, or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution." (*See* Dkts. 4, 5).

On April 21, 2025, a grand jury sitting in this District returned an Indictment charging the defendant with (1) the same two counts as those in the Complaint of making false statements to the FBI (Counts One and Two); (2) one count of conspiracy to violate the Mann Act (Count Three); (3) one count of conspiracy to violate the Travel Act (Count Four), both in violation of Title 18, United States Code, Section 371; and (4) naturalization fraud, in violation of Title 18, United States Code, Section 1015 (Count Five), based on the defendant's false representation on her naturalization application. (Dkt. 17).

### b.    The Defendant's Bail Violations

Soon after being arrested in this case and released on bail, the defendant began a months-long campaign to tamper with, threaten, and harass Case Agent-1, ultimately resulting in the Court's revocation of her bail on December 2, 2025. (*See* PSR ¶¶ 38-42).

Between March and July 2025, the defendant harassed Case Agent-1 through social media posts, long chains of unsolicited, sometimes threatening, messages, and an attempt to approach Case Agent-1 on the street, prompting a modification of her bail conditions and repeated admonitions from the Government, Pretrial Services, and the Court. (*See* PSR ¶¶ 38-39; Dkts. 28, 30, 36).

On September 13, 2025, the defendant sent approximately 50 unsolicited, back-to-back text messages to Case Agent-1, including demands that Case Agent-1 "[w]ake up" and "[c]all [] the court." (*See* PSR ¶ 40; Dkt. 36). On September 26, 2025, the Court held a bail hearing and denied the Government's motion to revoke the defendant's bail, advising the defendant that she was being offered a final chance.

On November 19, 2025, the defendant sent a series of unsolicited messages to Case Agent-1, writing that she did not "care about [her] trial" and that they "need to do something," and asking if Case Agent-1 "really want[s] [her] deportation." (*See* PSR ¶ 41; Dkt. 53). After calling Case Agent-1, the defendant resumed sending messages to him, asking, "You gonna report???"; asserting that "[his] discovery"—an apparent reference to the Rule 16 discovery produced to the

defense in this case—was "[f]ull of mistakes"; and calling Case Agent-1 and other unnamed Government personnel "idiots," as depicted below:



The defendant then continued sending harassing messages to Case Agent-1, in which she called Case Agent-1 a "[b]itch." (*Id.*). Finally, the defendant inquired about Case Agent-1's potential participation or attendance at the defendant's trial, asking: "[a]re you going to be on trial? Trial …. Us?" (*Id.*).

On November 29 and 30, 2025, after the Court had scheduled a bail hearing to address the most recent violations, the defendant sent another round of harassing messages to Case Agent-1, including an apparent reference to the next day's bail hearing: "See you Tuesday." (PSR ¶ 42; Dkt. 55).

On December 2, 2025, the Court revoked the defendant's bail and ordered her detained pending trial, finding probable cause that the defendant had committed federal witness tampering and cyberstalking offenses through her harassment of Case Agent-1. (Tr. at 27). As to witness tampering, the Court found that the defendant's statements to Case Agent-1 appeared intended "to influence the case agent's actions and testimony." (Tr. at 28). As to cyberstalking, the Court stated:

> [F]or months now, and in an escalating way, [the defendant] directed an onslaught of telephonic and electronic messages to the case agent that included implicit threats to harm the case agent's reputation and career, [the defendant] used profane

and sexually aggressive language, [the defendant] used disparaging language, [the defendant] made personal attacks . . . , and also pleaded on [her] own behalf in a way that appear[ed] calculated to try to cause emotional distress.

(Tr. at 28).  The Court further remarked that the defendant's conduct posed "a clear threat to the integrity of the trial process and [was] dangerously intrusive on [Case Agent-1's] life and work."  (Tr. at 30).

### c.  Plea Agreement and Guidelines Range

On February 19, 2026, the defendant pled guilty to Counts One and Five of the Indictment pursuant to a plea agreement (the "Plea Agreement").  In the Plea Agreement, the parties stipulated that the total offense level is 15 and that the defendant is in Criminal History Category I, resulting in a Guidelines range of 18 to 24 months' imprisonment.  The Probation Office agrees with this calculation.  (*See* PSR ¶¶ 52-76).

## III.    Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence.  *Id.* at 264.  As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

In determining the appropriate sentence, the statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

## IV.    The Court Should Impose a Sentence Within the Guidelines Range of 18 to 24 Months' Imprisonment

The Government respectfully submits that a sentence within the parties' agreed-upon Guidelines range of 18 to 24 months' imprisonment is warranted in this case to reflect the nature and seriousness of the defendant's offenses and promote deterrence.

*First*, the defendant's offenses were serious.  The defendant lied to the FBI in connection with a sensitive investigation into malign foreign influence.  She helped run a prostitution business over the course of several years.  She intentionally omitted her participation in that criminal enterprise on her naturalization application in an effort to obtain United States citizenship.  And then, after being arrested and released on bail, she repeatedly taunted, harassed, and threatened Case Agent-1.

The defendant criticizes the Government for "focus[ing]" on her false statements regarding her ties to Russian intelligence services, suggesting that the Government instead should be "thanking her for all the truthful information she provided." (Def. Sent'g Mem. at 6).  Yet it is difficult to conceive of witness conduct more detrimental to the integrity of a national security investigation than the concealment of the witness's own ties to—and taskings by—a foreign intelligence service.  The FBI must know an individual's affiliations to assess whether to engage with someone whose motivations and objectives may be directly at odds with FBI's truth-seeking mission, and to assess the reliability of that person's information.  The defendant, who claims that she "now knows better" (*id.*), knew full well at the time she lied to the FBI that her undisclosed affiliation with the FSB was of tremendous significance in her meetings with the agents.  Additionally, any "truthful information" provided by the defendant—who never served as a confidential human source for the FBI—was of minimal value to the FBI, and was not used to bring any charges.

The fact that, as the defendant notes, she "later acknowledged her relationship with [FSB Officer-1] in subsequent meetings with the FBI" (Def. Sent'g Mem. at 6), is not a mitigating circumstance.  The defendant did not spontaneously volunteer the truth out of some newfound compunction or "trust in the agents she was meeting with." (*See id.*).  Rather, she admitted to her lies only after the FBI developed independent evidence of them and confronted her.

Likewise, the Court should reject the defendant's attempts to downplay the seriousness of her concealment of her prostitution-related offenses.  Prostitution is a serious offense, often generating a profit through the exploitation of vulnerable and financially desperate young women, who are commonly trafficked or subjected to violence.  As the defendant acknowledges, she lied on her naturalization application out of a concern that her involvement in prostitution "would automatically disqualify her from citizenship." (Def. Sent'g Mem. at 6).  In other words, the defendant recognized that her lie was not only *material* to U.S. authorities' consideration of her citizenship application, but also potentially *dispositive*.  Indeed, the question the defendant answered falsely is aimed at ensuring that the rights and privileges attendant to U.S. citizenship are not granted to individuals who are committing serious crimes on American soil.  The defendant's invocation of the prospect of her deportation as a mitigating factor (*see id.* at 2) is particularly unpersuasive in light of her attempt to undermine the integrity of the naturalization process.

Finally, the defendant's harassing and obstructive conduct toward Case Agent-1 compounds the seriousness of her offenses. Law enforcement officers—particularly agents who, like Case Agent-1, investigate national security offenses—fulfill their duty to protect the public in spite of the personal sacrifices and risks their work entails. As the Court found, the defendant's direct, relentless targeting of Case Agent-1 "was dangerously intrusive on [his] life and work." (Tr. at 30). In sum, as the Probation Office notes in recommending a within-Guidelines sentence of 18 months' imprisonment, the defendant's "disregard for the law" is an "aggravating factor[]" that overcomes the mitigating factors argued by the defendant in seeking a time-served sentence. (PSR at 29).

Accordingly, a substantial term of imprisonment is necessary to provide just punishment for the defendant's conduct.

*Second*, a within-Guidelines sentence is necessary to promote respect for the law and provide specific deterrence. The defendant has demonstrated extraordinary contempt for the law by lying in connection with an FBI investigation, lying to subvert the administration of the naturalization process, and harassing Case Agent-1 in an attempt to influence the outcome of this case while out on bail.

The defendant's brazen defiance of her release conditions most clearly highlights the need for a meaningful prison sentence to provide for specific deterrence. Although she had no criminal history prior to this case, the defendant repeatedly committed crimes and violated court orders during the time period following her arrest and release on bail. She persisted in her illegal and threatening conduct even after multiple hearings at which the Court warned her of the consequences of noncompliance. As the Court recognized at the December 2, 2025 bail revocation hearing, the defendant "repeatedly . . . conduct[ed] activity that undermine[d] this case and the ability of this case to go forward" and did not appear "willing or able to stop [her]self." (Tr. at 25; *see also* Tr. at 30 (stating that the defendant's conduct was "escalating" and "extreme," and that the defendant had "repeatedly ignored [the Court's] orders and the conditions of [her] supervised release")). Thus, contrary to the defendant's argument (*see* Def. Sent'g Mem. at 7), her Guidelines calculation—including its application of a two-level increase for obstruction, with no decrease for acceptance of responsibility—appropriately accounts for her atrocious conduct while out on bail.

*Third*, a substantial term of imprisonment is necessary to promote general deterrence. The defendant asserts that "defendants routinely lie to law enforcement without such charges ever being brought." (Def. Sent'g Mem. at 1). But the fact that many individuals evade prosecution for lying to law enforcement is precisely *why* a significant sentence is necessary to promote general deterrence. The ability of federal law enforcement officers to root out criminal conduct depends, to a significant extent, on their ability to insist on full candor from individuals with whom they speak. It is vital that those who would lie to federal authorities expect that their deceptive conduct will be met with proportionate consequences.

Likewise, the naturalization process, through which hundreds of thousands of individuals obtain citizenship each year, cannot function properly if efforts to subvert it are not appropriately sanctioned. Thus, to provide adequate general deterrence and promote the orderly and fair administration of our immigration and naturalization system, sentences for conduct like the defendant's must be substantial.

## V.    Conclusion

For the reasons stated above, the Government respectfully requests that the Court impose a sentence within the Guidelines range of 18 to 24 months' imprisonment.[2]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    _____

Sarah Kushner / David Robles / Henry Ross
Assistant United States Attorneys
(212) 637-2676 / -2550 / -2442

---

[2] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).